## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**BRANDON FONTENOT**

**VERSUS**

**MARLIN N. GUSMAN, ORLEANS
PARISH SHERIFF, DEP. JEROME
HUGHES, DEP. JEFFERY RASBURY,
AND DEP. MARLON ELI**

**CIVIL ACTION**

**NO.  11-1772**

**UNITED STATES MAGISTRATE
JUDGE KAREN WELLS ROBY**

## ORDER AND REASONS

This matter was before the Court for non-jury trial on May 7, 2012, upon consent of the parties pursuant to 28 U.S.C. § 636(c).[1]  The plaintiff, Brandon Fontenot ("Fontenot"), was represented by counsel and all parties and their witnesses appeared before the Court.  Fontenot filed this complaint pursuant to Title 42 U.S.C. § 1983 and Louisiana state law alleging that he was beaten by an Orleans Parish Sheriff's Deputy while he was previously housed in the Orleans Parish Prison system ("OPP").

## I.     Testimony and Evidence at Trial

### A.     Testimony of Brandon Fontenot

Fontenot testified at trial that he is currently incarcerated at the B.B. "Sixty" Rayburn Correctional Center ("RCC") in Angie, Louisiana, serving a forty year sentence for possession of methamphetamine.  He further testified that, on July 23, 2010, while he was housed in OPP, prison

---

[1]Rec. Doc. No. 23.

staff began to transfer inmates from floor to floor in preparation for an evacuation due to a tropical storm forming in the Gulf of Mexico.

Fontenot stated that Deputy Hughes arrived at his cell in the early morning hours of July 23, 2010, and ordered Fontenot to gather his belongings to be moved. The defendant, Deputy Jerome Hughes ("Deputy Hughes" or "Hughes") escorted Fontenot from his cell on the sixth floor of the House of Detention ("HOD") to a cell on the south side of the third floor, Tier S3, Cell 03.

Fontenot testified that on the way to the third floor, he asked Hughes why he was being moved when he was a Louisiana Department of Corrections ("DOC") inmate. Hughes responded that he did not know why and that he was "just transportation." Fontenot then told Hughes that he was probably going to call his family to get this straightened out. Fontenot testified that he did not want to be moved to an HOD floor, because DOC inmates received more privileges when they were housed together in other sections of the jail.

Fontenot further testified that when they arrived at Cell 03, he immediately noticed that the cell was overcrowded and that there was no place for him to sleep.[2] In response, he asked to speak with "rank", or one of Hughes' superior officers. Deputy Hughes refused, became angry, and threw Fontenot's belongings on top of an inmate who was sleeping on the cell floor. Fontenot then voluntarily proceeded into the cell by sliding in between the inmates currently in the cell. After doing so, he picked up a telephone that was purportedly in the cell, and told Hughes that he intended to call his family to report that he was being placed in an overcrowded cell.

Fontenot stated that, in response, Deputy Hughes slammed the cell door shut from the outside and then walked off. Approximately five or ten seconds later, Deputy Hughes returned and

---

[2]The Location Census for Tier S3, Cell 03 on July 23, 2012 indicates there were a total of eighteen (18) inmates in the cell on that date. See Plaintiff's Exhibit No. 3.

entered the cell. He put his forearm up against Fontenot's neck, punched Fontenot in the chin, "body slammed" him to the floor of the cell, "roughed him up" and "threw him around" on top of other inmates and their beds. Fontenot testified that he felt the ligaments in his left shoulder tear and the shoulder become dislocated.

Fontenot also testified that he previously had strained his shoulder playing football when he was 12 or 13 years old and a few times during his life when he did manual labor, but he did not require medical treatment. According to Fontenot, he did not experience a dislocated shoulder before this incident. Fontenot immediately reported his dislocated shoulder to Deputy Hughes and asked to be seen by the OPP medical staff. Hughes allegedly refused his request and responded "f__k you."

Fontenot also testified that another defendant, Deputy Jeffery Rasbury ("Deputy Rasbury" or "Rasbury")), arrived at the cell after the incident with Deputy Hughes. Fontenot stated that he reported his dislocated shoulder to Deputy Rasbury and asked to be seen by the OPP medical staff. According to Fontenot, Hughes told Rasbury "[d]on't worry about it", and the two deputies left Fontenot lying on the floor of the overcrowded cell.

Fontenot testified that, after he was slammed and pushed by Deputy Hughes, he was unable to move his shoulder for three hours following the incident. He further testified that it was only with the help of an unidentified inmate that he was able to put his dislocated shoulder back into place.

Fontenot testified that after his shoulder was back in place, he asked the other inmates in the cell if they would sign a witness statement. Ten of the other inmates agreed and each signed the

statement that was handwritten by Fontenot.[3]  Fontenot testified that the other inmates did not sign it because they were sleeping or in a bad mood due to the incident.

Fontenot stated that he was unable to immediately call his family to report his dislocated shoulder because the phones were disconnected due to the impending tropical storm and inmate transfers.  He further testified that neither Deputy Hughes nor Deputy Rasbury returned to his cell after the incident, but that he reported his dislocated shoulder to an unidentified female OPP staff member who was performing a roll call.  In response, she told him that she would look into it, but she never returned to the cell.

When the phones were turned back on, around 4:30 p.m., Fontenot called his aunt, Carol Griffin ("Griffin"), and reported he had been moved to the third floor and beat up by one of the OPP staff members.  He also told her that his shoulder had been dislocated, but that his requests to see OPP medical staff were refused.  According to Fontenot, Griffin immediately called OPP.  Soon thereafter, he was taken to see an OPP nurse.

Fontenot testified that approximately three days after the incident, he asked Deputy Hughes, who was doing roll call at the time, for his name.  When Hughes asked Fontenot why he wanted to know his name, Fontenot told him that he intended to report Hughes's name to his family.  In response, Hughes "stormed off."  An inmate in Fontenot's cell later informed Fontenot of Hughes's name.

Fontenot testified that Deputy Hughes later returned to Fontenot's cell and removed him so they could talk.  After taking Fontenot down the hallway, Hughes encouraged Fontenot to tell an unidentified OPP staff member that nothing happened so they "could get this out of the way."

---

[3]See Plaintiff's Exhibit 1.  Only two of the ten inmates who purportedly signed the handwritten statement testified at trial.

Deputy Hughes told Fontenot that if he refused to do so, he would write Fontenot up and manufacture disciplinary and/or criminal charges against him for threatening an officer and for assault on an officer. Fontenot stated that he refused to withdraw his statement and complaints. As a result, Fontenot alleges Hughes manufactured disciplinary charges against him.

Fontenot testified that he was later taken to Lieutenant Harris's office and questioned by Harris, an unidentified Major, and an unidentified Captain about Hughes's disciplinary write-up. According to Fontenot, Harris did not tell him why he was charged or what he was accused of doing, but that the investigation of the write-up would be put on hold while the internal affairs division investigated Fontenot's grievance against Hughes. Fontenot alleges that he was not questioned about Hughes's write-up again, nor was he found guilty of the alleged infraction.

Fontenot also indicated that he later filed Step 1, Step 2, and Step 3 grievances and gave multiple statements about the incident to numerous OPP staff members. He further testified that his family and an unidentified friend reported the incident to the American Civil Liberties Union ("ACLU"). They were referred to the Attorney's General Office, but they did not speak with anyone in the Orleans Parish Sheriff's office.

Fontenot further alleges that all three defendants conspired together to cover up what happened, and falsely accused him of making racially derogatory comments to Hughes, after which Hughes simply shut the cell door and walked away. Fontenot testified that he did not call Hughes any racially derogatory names, nor did he threaten Hughes.

Fontenot stated that after his aunt called the jail on the day of the incident, he was seen by an unidentified African-American female nurse who looked at his shoulder, asked him to demonstrate his range of motion and noted the red marks on his chest. Fontenot testified that, at the

time of the examination, he was unable to raise his arm above his nose or reach his arm around to touch the center of his back as she requested he do. The nurse gave him some Ibuprofen, and told him that he would have to go without an arm sling because arm slings were not given out at OPP. Fontenot stated that he was prescribed and received one 600 milligram Ibuprofen tablet twice per day, but it did not help. He also testified that he was already receiving Ibuprofen for reoccurring migraine headaches.

According to Fontenot, the nurse told him that an x-ray was needed to determine the need for further medical treatment. Some time thereafter, the OPP medical doctor order that he be taken for an x-ray of his shoulder. This was completed sometime in September of 2010. Fontenot also testified that he did not receive any other medical treatment between July of 2010 to sometime in September of 2010. After the x-ray, he also did not receive any follow up from the OPP medical doctor nor did he receive a medical diagnosis about his shoulder.

He stated that he did not receive any additional medical care from after the x-ray in September of 2010 until he was transferred out of OPP in February of 2011, despite multiple complaints of pain and limited range of motion, and requests for medical treatment. Instead, he was told that his requests would be addressed once he was transferred out of OPP to the Elayn Hunt Correctional Center ("Hunt") in St. Gabriel, Louisiana.[4]

Fontenot testified he was transferred to Hunt in February of 2011, and that in March of 2011, he was examined by an orthopedic doctor and underwent a magnetic resonance imaging ("MRI"). He further testified that he was transferred to RCC in April of 2011, and that a computed axial tomography ("CAT") scan was done in February of 2012. According to Fontenot, the medical

---

[4]Fontenot testified that he was transferred to Hunt in February of 2011, and then to his current location, RCC, in April of 2011.

doctor at RCC later told him that his MRI showed damage to his rotator cuff, but did not give him a specific medical diagnosis.  Fontenot was unable to identify his specific medical diagnosis.

Fontenot testified that his shoulder still slips out of socket approximately once every four to eight weeks, and that it has been slipping out of socket more frequently in recent months. Sometimes, he is able to pop his shoulder back into place on his own.  Other times, the medical doctor at RCC must help him do so.

Fontenot also testified that he did not receive any additional medical treatment between July of 2010 to sometime in September of 2010, leaving it unclear as to whether he continues to receive Ibuprofen.  He testified, however, that he has been advised that he will need corrective surgery, and that he is to have a surgical conference with an orthopedic doctor, and then corrective surgery at an outside hospital within the next couple of months.

Fontenot further testified that he is not undergoing physical therapy and that he is able to put on a shirt unassisted.  He also stated that he was given a limited duty status by the medical staff at Hunt and RCC.  He testified that he continues to suffer constant pain, is unable to lift his arm above his head, and has to seek medical assistance all of the time.

### B.    Testimony of Oneal Price

Oneal Price ("Price") was incarcerated at OPP in Cell 03 when the incident occurred.  Price testified that at the time, there were 13 to 15 inmates in what was a 10 man cell.  According to Price, when Fontenot arrived at the cell, he told Deputy Hughes that he was a DOC inmate and that the cell was overcrowded, and requested to speak to the OPP medical staff and rank.  Price did not recall what Hughes said in response.  He further testified that, immediately after Fontenot and Hughes exchanged words, Hughes entered the cell, pushed Fontenot hard against the wall, and slammed him

to the ground causing injury to Fontenot's shoulder.  Price testified that he did not see Hughes punch Fontenot in his chin, nor did he hear Fontenot use any racial slurs.

Price further testified that immediately following the incident, Hughes exited the cell and walked down the hallway.  According to Price, Fontenot complained that his shoulder was broken.  Price helped him take off his shirt, and he noticed a knot and red bruise on Fontenot's shoulder.  Thereafter, Fontenot wrote a telephone number on a piece of paper and asked the other inmates to call his family and report the incident if the OPP staff removed him from the cell, and Price volunteered to so.  During that time, Fontenot also handwrote a statement, which Price read and signed before Fontenot was removed from the cell.  When asked whether he read the allegation in the handwritten statement that Hughes punched Fontenot, Price testified that he did read it and that he considered a push to be a punch.

According to Price, about 15 to 30 minutes after Hughes exited the cell, two unidentified OPP deputies entered the cell and removed Fontenot.  At that time, Price called Fontenot's family, described the incident, and encouraged them to call OPP.  Price testified that Fontenot did not return to the cell.

C.     **Testimony of Renaldo Taylor**

Renaldo Taylor ("Taylor"), who was also incarcerated at OPP on the date of the incident, testified that he was in the cell when the incident occurred.  According to Taylor, there were 17 inmates in the cell at the time of the incident.  He also testified that upon Fontenot's arrival at the cell, he asked the deputy escorting him a question.  Taylor initially was unable remember what Fontenot asked the deputy.  However, after further questioning on direct examination and by the Court, Taylor testified that Fontenot asked to see rank and the OPP medical staff.  He also testified

that Fontenot did not insult the deputy or use any racial slurs. Taylor also was unable to recall the deputy's name. Instead, he described him as a "big, Black, fat guy" who looked like he weighed almost 300 pounds.

According to Taylor, in response to Fontenot's request, the deputy opened the cell door, entered the cell, grabbed Fontenot, punched him in his face and chest, slung him around the cell, knocked him to the ground, kicked him, and punched him "everywhere" while he was on the ground. Taylor further testified that once the deputy got Fontenot on the ground, he twisted one of Fontenot's arms around Fontenot's back, and put his knee into Fontenot's back. He did not see the deputy attempt to handcuff Fontenot. After placing his knee in Fontenot's back, the deputy got up, exited the cell, and closed the cell door. Taylor indicated that Fontenot did not attempt to resist. Taylor was unable to recall how long the incident lasted.

Taylor also was unable to recall whether Fontenot's ribs or arms were injured as a result of the incident. When he asked Fontenot if he was alright, Fontenot did not tell him where he had pain. Taylor further testified that he remained on the third floor tier with Fontenot for five or six days. During that time, Fontenot did not leave the third floor tier nor was he seen by the OPP medical staff.

Taylor also testified that some time after the incident, Fontenot wrote a statement. Taylor was unable to read the statement, however, so Fontenot read it to him. After Fontenot read the statement to him, Taylor signed it.

### D. Testimony of the Defendant Deputies

The defendants, Deputy Hughes, Deputy Rasbury, and Deputy Marlon Eli ("Eli"), each testified at trial and repeatedly denied that the incident occurred. They each denied that Deputy

Hughes used force against Fontenot or that Fontenot was injured. They also each denied that Fontenot requested to see the OPP medical staff before or after he entered Cell 03. Deputies Rasbury and Eli also testified that they were unaware Fontenot had filed grievances or complained about the alleged incident until they were informed of the internal investigation and asked to give a statement. Hughes testified that he was made aware of Fontenot's accusations and the internal affairs investigation two days after the alleged incident by the day shift supervisor, Lieutenant Taylor. Hughes also testified that he participated in the investigation. Each of the deputies testified that they were not disciplined as a result of the investigation.

### 1.  Testimony of Deputy Hughes

Deputy Hughes, who had worked for the Orleans Parish Sheriff's Office for over five years, testified that Fontenot refused to go into the Cell 03 because of the number of inmates that were in the cell. In response, he told Fontenot that the move was only temporary. Deputy Hughes then signaled Deputy Eli, who was manning the tier gate, to open the cell door. According to Hughes, after Fontenot again asserted that he was not going to enter the cell, Hughes took Fontenot's personal belongings and placed them on the cell floor. Hughes denied throwing Fontenot's personal belongings on the cell floor. Fontenot then voluntarily entered the cell. Before Deputy Eli could close the cell door, however, Fontenot turned around and said to Hughes, "F__k you Nigger. I got you." Hughes stated that Fontenot said it quietly enough so that Deputy Rasbury, who was standing nearby, and the other inmates could not hear him. Hughes, however, heard him.

According to Hughes, he did not verbally respond to Fontenot or use physical force. Instead, he and Deputy Rasbury exited the tier, and he took the elevator to the second floor where he went

to the restroom.  Deputy Hughes denied returning to the cell and further testified that after he went to the restroom, he clocked out and left OPP.

Hughes also denied that he took Fontenot out of his cell a few days after the alleged incident or that he threatened to write Fontenot up if he did not withdraw his grievances.  According to Hughes, a few nights after the alleged incident he was assigned to do roll call on the ninth floor where Fontenot was then housed.  When he arrived at Fontenot's cell, Fontenot jumped off the top bunk bed, landed with both feet on the floor, and told him, "I got you.  My people are going to take care of this."  Hughes testified that he did not respond to Fontenot.  Instead, once he completed roll call, he called the Control Center, informed them that Fontenot was assigned to the ninth floor, and requested to be reassigned to another floor, which request was granted.  He stated that he has not seen or spoken to Fontenot since that night.

Hughes also testified that he did not write a disciplinary report against Fontenot following the alleged incident.  Rather, a disciplinary report was written by one of his supervisors, Lieutenant Jenkins ("Jenkins"), who insisted that a report had to be written as part of the internal investigation. Hughes testified that he did not feel Fontenot's actions warranted a write-up, and that he had only written up inmates for abusive language four or five times during the course of his employment.  He testified, however, that he signed the report, because Jenkins instructed him to do so.  He also testified that he did not read the report before he signed it.

### 2. Testimony of Deputy Rasbury

Deputy Rasbury, who had been employed with the Orleans Parish Sheriff's Office since January of 2008, testified that he was on the tier at the time of the alleged incident.  After moving inmates into a cell on the north side of the floor, Rasbury noticed Deputy Hughes and Fontenot

standing in front of Cell 03.  Deputy Rasbury then proceeded down the tier to Cell 03 to back up Hughes.  According to Rasbury, Hughes repeatedly asked Fontenot to enter the cell.  Fontenot, instead complained that there were too many inmates in the cell and asked to speak to rank.  In response, Hughes told Fontenot that rank had ordered his transfer due to the impending tropical storm, and then placed Fontenot's personal belongings on the cell floor.  Subsequently, Fontenot voluntarily entered the cell.  Before the cell door closed, however, Fontenot said to Hughes, "F__k you black bitch.  I got you."  Rasbury denied that Hughes responded to Fontenot in any way.  He stated that, instead, he and Hughes exited the tier, and took the elevator to the second floor.  Hughes testified that he then clocked out and left OPP.  He did not know whether Hughes went back up to the cell.

### 3.     Testimony of Deputy Eli

Deputy Eli, who had worked for the Orleans Parish Sheriff's Office since January of 2010, was working the tier gate post at the time of the incident.  He was not involved in the transfer of inmates, because he was assigned to remain at the tier gate.  Eli testified that the tier gate is approximately 20 feet away from the Cell 03.  He further testified that he was unable to hear what Hughes and Fontenot said due to the noise level on the tier.  According to Eli, Hughes did not use force against Fontenot or enter the cell.  Rather, Fontenot entered the cell voluntarily.  Deputy Eli also testified that Hughes did not throw Fontenot's personal belongings on the cell floor or follow Fontenot into the cell.  Deputy Eli stated that, at the time, he was monitoring multiple cells and the other inmate transfers at the time.  Thus, he conceded that it was possible that Hughes entered the cell while his attentions were elsewhere.  According to Eli, however, his attentions would have been diverted only for a few seconds.

## II.     **Findings of Fact and Conclusions of Law**[5]

As an initial matter, Fontenot moved at trial to voluntarily dismiss the federal and state law claims urged against the defendant, Orleans Parish Sheriff Marlin Gusman. As the matter was not entered into the minutes of the trial by the deputy clerk of court, out of an abundance of caution, the Court again grants the plaintiff's request and now proceeds to address the remaining claims and defendants.

Fontenot has alleged that the defendants, Hughes, Rasbury, and Eli, violated his Fourth and Fourteenth Amendment rights against unreasonable search and seizure, violated his Eighth Amendment rights against cruel and unusual punishment, and conspired to cover up the events in violation of the Fourteenth Amendment. He also claims that Hughes retaliated against him for filing grievances by placing false disciplinary charges against him. Fontenot has also urged claims of assault, battery, and intentional infliction of emotional distress against Hughes under Louisiana tort law.

### A.     **Fourth and Fourteenth Amendment Claims for Unreasonable Search and Seizure**

Fontenot alleges that Hughes, Rasbury, and Eli violated his Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure. Fontenot offered no testimony or explanation of this claim at trial.

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *United States v. Jones*, __ U.S. __, 132 S. Ct. 945, 949 (2012). This protection is made applicable to the States by the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643,

---

[5]To the extent the findings of fact are conclusions of law, and vice versa, they are deemed so and accepted.

655 (1961). However, "'[a] prisoner's rights are diminished by the needs and exigencies of the institution in which he is incarcerated. He thus loses those rights that are necessarily sacrificed to legitimate penological needs.'" *Moore v. Carwell*, 168 F.3d 234, 236-37 (5th Cir. 1999) (quoting *Elliott v. Lynn*, 38 F.3d 188, 190-91 (5th Cir. 1994)). The Supreme Court thus has held that prisoners have no expectation of privacy in their cells and "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson v. Palmer*, 468 U.S. 517, 525-26 (1984).

When searches are done of the prisoner or his cell, they "must be reasonable under all the facts and circumstances in which they are performed." *United States v. Lilly*, 576 F.2d 1240, 1244 (5th Cir. 1978), *abrogated on other grounds by Hudson*, 468 U.S. at 523 & n.5. The Court explained that "[b]ecause a prison administrator's decisions and actions in the prison context are entitled to great deference from the courts, the burden of proving reasonableness is a light burden." *Id.*, at 1245. Even so, the Courts must balance the need for the particular search against the invasion of the prisoner's personal rights caused by the search. *See Elliott*, 38 F.3d at 191 (citing *Bell v. Wolfish*, 441 U.S. 520, 558 (1979)). In doing so, the Courts consider the "scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559.

The Supreme Court has stated that "a 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." (footnotes omitted) *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Fontenot has not explained

or pointed to any particular act by the defendants that would constitute a search or seizure of his person, his cell, or his things.

At trial, Fontenot testified that, when they arrived at Cell 03, Deputy Hughes took his personal belongings from his hands and threw them to the floor in Cell 03. The deputies each denied that this happened. Instead, they each testified that Hughes took Fontenot's personal belongings and placed them on the floor of the cell when Fontenot refused to enter the cell.

To whatever extent Fontenot meant this movement as an unlawful search or seizure, he has failed to prove a claim. Fontenot has not described any action by any defendant that would fall into these categories. He has not testified to any search of his belongings. He has not described a taking of his property that deprived him of his ownership interest. He has failed to state a violation of the Fourth or Fourteenth Amendments prohibition against unreasonable search or seizure.

To the extent he suggests that escorting his person from one cell to another in the facility was a seizure, his claim fails. First, Fontenot was already in custody and had no expectation that he would be protected from continued custody. In addition, the law is clear that a prisoner has no constitutional right to choose the location of his confinement or to be housed in or remain in a particular cell block or wing of a prison. *Yates v. Stalder*, 217 F.3d 332, 334 (5th Cir. 2000); *Thomas v. Rayburn Corr'l*, No. 07-9203, 2008 WL 417759, at *3 (E.D. La. Feb. 13, 2008) (report adopted by order); *Castillo v. Blanco*, No. 07-215, 2007 WL 2264285, at *10 (E.D. La. Aug. 1, 2007) (report adopted by order); *Luedtke v. Gudmanson*, 971 F. Supp. 1263, 1271 (E.D. Wis. 1997).

With no evidence of an unlawful search or seizure, Fontenot has failed to prove a violation of his Fourth and Fourteenth Amendment rights.

## B.    Eighth Amendment Claims

Fontenot asserts that Deputies Hughes, Rasbury, and Eli violated his Eighth Amendment right to be free from cruel and unusual punishment.  "'[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'"  *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).  The Supreme Court has stated that "[a]mong 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'"  *Id*. (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)).  In making this determination in the context of prison conditions, the courts must ascertain whether the officials involved acted with "deliberate indifference" to the inmates' health or safety.  *Id*. at 738 (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).  The courts can infer the existence of the subjective state of mind when the facts showing the risk of harm are obvious.  *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

The Supreme Court has declared that the proof necessary to establish an "unnecessary and wanton infliction of pain" varies according to the nature of the alleged constitutional violation.  *Hudson*, 503 U.S. at 5 (citing *Whitley*, 475 U.S. at 320).  In this case, the facts suggested by Fontenot involve the use of excessive force by Deputy Hughes and the failure by Deputies Rasbury and Eli to protect him from the use of excessive force.

### 1.    Excessive Force by Deputy Hughes

In the context of prison life, the "core judicial inquiry" in considering excessive force under the Eighth Amendment, is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson*, 503 U.S. at 7; *see also Whitley*, 475 U.S. at 319-21.  "Often, of course, there will be no evidence of the detention facility official's

subjective intent, and the trier of fact must base its determination on objective factors suggestive of intent." *Valencia v. Wiggins*, 981 F.2d 1440, 1446 (5th Cir. 1993). The Courts consider five nonexclusive factors in determining intent and whether an excessive force claim has been established: (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need for and the amount of the force used; (4) the threat reasonably perceived by the officials; and (5) the efforts made to temper the severity of a forceful response. *Baldwin v. Stalder*, 137 F.3d 836, 839 (5th Cir. 1998); *Williams v. Valenti*, 432 Fed. App'x. 298, 301 (5th Cir. 2011); *Moss v. Brown*, 409 Fed. App'x. 732, 733 (5th Cir. 2010).

"When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident." *Hudson*, 503 U.S. at 9; *Wilkins v. Gaddy*, __ U.S. __, 130 S. Ct. 1175, 1178 (2010) (internal quotation marks omitted). The Supreme Court has made clear, however, that "not every malevolent touch by a prison guard" is prohibited by the Eighth Amendment." *Hudson*, 503 U.S. at 9 (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."). The Supreme Court has consistently held that the prohibition against cruel and unusual punishment "excludes *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id.* at 9-10 (quoting *Whitley*, 475 U.S. at 327) (other quotations and citations omitted); *Wilkins*, 130 S. Ct. at 1178.

The Supreme Court has reiterated its long-standing burden of proof that in order to prevail, the prisoner-plaintiff "will ultimately have to prove not only that the assault actually occurred but also that it was carried out 'maliciously and sadistically' rather than as part of 'a good-faith effort

to maintain or restore discipline.'" *Wilkins*, 130 S. Ct. at 1180 (quoting *Hudson*, 503 U.S. at 9. Further, if he can succeed at this, "the nature of his alleged injuries will no doubt limit the damages he may recover." *Id*.

In addressing whether a certain level of injury must be proven by the plaintiff, the Supreme Court in *Wilkins* discussed the law in the Fifth Circuit:

> The Fifth Circuit has sometimes used language indicating agreement with the Fourth Circuit's approach [of requiring more than a *de minimis* injury]. See, *e.g.*, *Gomez v. Chandler*, 163 F.3d 921, 924 ([5th Cir.] 1999) ("[T]o support an Eighth Amendment excessive force claim a prisoner must have suffered from the excessive force a more than *de minimis* injury"). But see *Brown v. Lippard*, 472 F.3d 384, 386 ([5th Cir.] 2006) ("This Court has never directly held that injuries must reach beyond some arbitrary threshold to satisfy an excessive force claim"). Even in the Fifth Circuit, however, Wilkins likely would have survived dismissal for failure to state a claim because that court's precedents have classified the sort of injuries alleged here as non- *de minimis*. See, *e.g.*, *ibid*. (permitting a prisoner's Eighth Amendment excessive force claim to proceed to trial where evidence indicated that the prisoner suffered "one-centimeter abrasions on both his left knee and left shoulder, pain in his right knee, and tenderness around his left thumb," as well as "back problems"); *Gomez*, 163 F.3d, at 922 (refusing to grant summary judgment on *de minimis* injury grounds where the prisoner alleged "physical pain [and] bodily injuries in the form of cuts, scrapes, [and] contusions to the face, head, and body").

*Wilkins*, 130 S. Ct. at 1179 n.2 (formatting added). The Court therefore recognized that it is appropriate to follow Fifth Circuit precedent to consider but not exclusively rely upon the absence of more than a *de minimis* injury in determining whether excessive force has occurred. *See Miles v. Staude*, 2012 WL 3264282, at *1 (5th Cir. Aug. 10, 2012) (Table, text in Westlaw).

The Fifth Circuit continues to follow the *Hudson* rule which states that the "extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation, 'or instead evince[] such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Hudson*, 503 U.S. at 7. Thus, as mentioned by the Supreme Court in *Wilkins*, in the Fifth Circuit "a

prisoner must have suffered from the excessive force a more than *de minimis* physical injury, but there is no categorical requirement that the physical injury be significant, serious, or more than minor." *Gomez*, 163 F.3d at 924.

During the trial in this matter, the testimony clearly showed that Fontenot was resistant to entering Cell 03. Fontenot testified that he told Deputy Hughes he did not want to go into the overcrowded cell. He also testified that he wanted to remain on a tier with other DOC inmates where the amenities were better than in other areas of the jail. He also conceded that he did not comply with Deputy Hughes's repeated requests to enter the cell. Deputy Hughes then took Fontenot's belongings and put them in the cell on the floor. Fontenot then acquiesced and entered the cell.

By all accounts this is where the incident should have ended. Instead, the credible testimony establishes that Fontenot made a derogatory comment directed towards Deputy Hughes as he walked away. Deputy Hughes at some point[6] entered the cell and pushed, shoved and/or slammed Fontenot against the wall and to the ground. While there was verbal provocation, there was no physical threat to Deputy Hughes at that time, especially in light of the bars and cell door between him and Fontenot when the insulting comments were made. There was no need for force to restore discipline in the manner intended by the Supreme Court in the precedent cited above.

The Court finds that the testimonial evidence establishes that the incident, a short lived physical altercation, occurred between Fontenot and Deputy Hughes. The Court finds it significant, as some proof of the incident occurring, that prison officials engaged in an in depth investigation of the events that occurred that day. After doing so, none of the officers were disciplined and neither

---

[6] The testimony conflicted as to whether he immediately returned or later returned. Either way the Court finds that he did return.

were the disciplinary charges pursued against Fontenot. If Fontenot was found to have fabricated the allegations about the attack, there surely would have been a different result and possible disciplinary action.

Fontenot also testified that he suffered injury to his left shoulder, causing him to initially need assistance to take off his shirt and that he was unable to move his arm for several hours after the incident. He also offered the testimony of Price, who stated that, when he helped Fontenot take off his shirt, he saw a knot and redness in the shoulder area.

Fontenot also testified about his efforts to seek and obtain medical care. As outlined previously, he stated that he was examined by a nurse and was given Ibuprofen. The nurse also reportedly told him that he would need an x-ray to determine whether he suffered an injury to the shoulder. He claims that he later was sent for the x-ray and was not informed of the results. He also sought care at Hunt and RCC, and speculates that he may need surgery to repair the on-going damage to the shoulder.

In support of his testimony, Fontenot submitted into evidence the notes of an unidentified OPP nurse who examined him on the date of the alleged incident.[7] According to the nurse's notes, Fontenot was at that time able to remove his shirt, move his arms, and ambulate without difficulty. While she noted red discoloration on his chest and knee, she indicated that there was no apparent distress.

The notes do not mention that she gave him Ibuprofen or that she discussed him having an x-ray taken. Her notes also do not indicate that she made a finding that he was without injury; she did after all note the altercation and conduct an examination. Instead, the nurse simply noted that

_____

[7]Neither party identified the nurse during the trial. Further, her signature at the bottom of the page is illegible.

Fontenot was able to move without difficulty. That does not necessarily mean she saw no injury. What is most significant to the Court is that the nurse found some evidence of injury to his chest and knee, which were places about which he complained at trial. There is evidence of an injury.

On the other hand, the defendants offered no medical testimony or other evidence to refute Fontenot's testimony regarding the existence of an injury and the treatment received from the nurse at OPP. Having noted this, the Court finds that Fontenot suffered injury as a result of the altercation with Deputy Hughes.

However, nothing in the record supports his allegations that his injury was as severe as he now claims it to be. Fontenot offered no records from any of the facilities that would support the testimony regarding the continued nature and severity of his shoulder problems. His testimony regarding his potential need for surgery is speculative at best. In addition, Fontenot's own concessions reflect that he suffered with shoulder problems most of his life, starting in his preteen years. The injury described as a result of the altercation at issue here appears to be an aggravation of his admittedly pre-existing problem. The Court finds that the testimony regarding the extent of the injury is exaggerated and without objective support.

For these reasons, the Court finds that Fontenot has established that force was used without need and that he suffered an injury as a result, demonstrating the wantonness of Deputy Hughes's actions. The Court finds that this claim has merit and that Fontenot is entitled to damages for the injury to his shoulder.

### 2. Failure to Protect From Excessive Force by Deputies Rasbury and Eli

Fontenot also urges a claim against Deputies Rasbury and Eli for failure to protect him from Hughes's aggression. The failure to protect an inmate from the use of excessive force by others can

give rise to liability under § 1983.  The same reasoning applies when a prison guard knows of a substantial risk of harm and fails to take reasonable measures to protect an inmate from another guard's use of excessive force.  *Davis v. Cannon*, 91 Fed. App'x. 327, 329 (5th Cir. 2004) (applying the Fourth Amendment analysis in *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) in the prison context under the Eighth Amendment); *Garza v. U.S. Marshals Serv.*, No. B-07-052, 2008 WL 501292, at *3 (S.D. Tex. Feb. 21, 2008) (same); *Smith v. Franklin*, No. 10-0138-RET-CN, 2010 WL 5563507, at *2 n.2 (M.D. La. Dec. 6, 2010) (noting that the *Farmer* intentional indifference to a known substantial risk factor still applies to a by-standing officer's failure to protect).

In this case, the evidence, including the plaintiff's witness testimony, does not establish that either Deputy Rasbury or Deputy Eli were present when the altercation occurred between Fontenot and Deputy Hughes.  Fontenot speculated that Deputy Eli could have seen the attack from his post, but he offered no proof of this.  The witness testimony also showed that Deputy Rasbury was either not present or left the scene before Deputy Hughes returned to enter the cell.  Both Deputy Rasbury and Deputy Eli testified that they never saw an altercation and never saw Deputy Hughes re-enter the cell.  The evidence is consistent that neither deputy actually saw Deputy Hughes shove, push or slam Fontenot.  For this reason, there has been no showing of an intentional indifference on the part of Deputy Rasbury or Deputy Eli to a known risk to Fontenot that he would be injured by Deputy Hughes.  This claims fails.

**C.**     **First and Fourteenth Amendment Claims for Retaliation and Conspiracy**

Fontenot also alleges that Deputies Hughes, Rasbury, and Eli violated his First and Fourteenth Amendment rights by causing false disciplinary charges against him and conspiring to cover-up the incident.

Fontenot contends that the three deputy defendants conspired to cover-up the incident. To establish a cause of action based on conspiracy a plaintiff must show that the defendants agreed to commit an illegal act. *Moreland v. Roscko*, 254 Fed. App'x. 361, 362 (5th Cir. 2007) (citing *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982). He has offered no evidence that the three deputies actively engaged in steps to cover up the incident in which excessive force was used. As noted above, the testimony showed that neither Rasbury nor Eli saw an altercation. If they did not see an altercation, they were not covering anything up when they reported to other prison officials that they saw nothing. Although Hughes has denied the incident occurred, he can not by definition conspire with himself. Fontenot has failed to prove a conspiracy.

Fontenot also alleges that Deputy Hughes falsified disciplinary charges against in retaliation for his complaints about the attack. The evidence indicated that Fontenot filed grievances related to the altercation in the cell. These grievances apparently led to the investigation of the incident. This is not denied or refuted. Fontenot also testified that he completed the three step grievance process at OPP although he was unsuccessful.

To prove a retaliation claim under § 1983, a prisoner plaintiff must establish: (1) a specific constitutional right at issue; (2) the defendant's intent to retaliate against the prisoner for his exercise of that right; (3) a retaliatory adverse action; and (4) causation. *Jones v. Greninger*, 188 F.3d 322, 324-25 (5th Cir. 1999) (citing *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998)). The Fifth Circuit has also cautioned that "[t]o assure that prisoners do not inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around them, trial courts must carefully scrutinize these claims." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995).

The inmate must prove more than his personal belief that he is the victim of retaliation. *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997). Instead, the inmate must show causation by proving that "but for the retaliatory motive the complained of incident . . . would not have occurred." *Woods*, 60 F.3d at 1166. This is recognized as a "significant burden" that requires the inmate to "produce direct evidence of motivation or, the more probable scenario, 'allege a chronology of events from which retaliation may plausibly be inferred.'" *Randle v. Woods*, 299 Fed. App'x 466, 468 (5th Cir. 2008); *Shelton v. Lemons*, 2012 WL 3493982, at *2 (5th Cir. Aug. 15, 2012).

Under these standards, the inmate must point to a specific constitutional right that has been violated as a direct result of the retaliatory action. *Tighe v. Wall*, 100 F.3d 41, 42 (5th Cir. 1996); *Woods*, 60 F.3d at 1166. An adverse action under the third prong is an act "capable of deterring a person of ordinary firmness from further exercising his constitutional rights." *Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006). The Court stated that "this threshold is intended to weed out only inconsequential actions and is not a means to excuse more serious retaliatory acts by prison officials." *Id*.

For this reason, "mere conclusory allegations of retaliation" or a prisoner's own beliefs are insufficient to establish retaliation. *Jones*, 188 F.3d at 325; *see also Randle*, 299 Fed. App'x. at 468. Instead, a prisoner must either "produce direct evidence of motivation" or "allege a chronology of events from which retaliation may plausibly be inferred." *Jones*, 188 F.3d at 325. Based on the foregoing, Fontenot has not established his entitlement to recover for retaliatory acts against him.

The evidence at trial tends to establish that disciplinary charges were placed against Fontenot as a result of the investigation initiated only after he filed his grievance complaint about Deputy

Hughes. During the trial, Fontenot testified that a few days after the alleged incident, Hughes pulled Fontenot out of his ninth floor cell and told him that he would file disciplinary charges against him unless he withdrew his complaint regarding the incident. Fontenot testified that he refused to withdraw his complaint. Shortly thereafter, Hughes issued a disciplinary charge against him.

Hughes denied having this conversation with Fontenot. He instead testified that a few days after the incident, he saw Fontenot on the ninth floor and Fontenot told him he was going to get him for the attack. Hughes stated that he ignored the comment and immediately asked for a transfer to another floor.

The Court is not persuaded that Hughes did not engage with Fontenot on the ninth floor that day. The evidence and timing of events offered by both parties confirms that, shortly after this occurrence, Hughes signed a disciplinary charge against Fontenot. While Hughes testified that he only signed the report after it was prepared by a superior officer, the Court is not persuaded that Hughes was without some inappropriate motivation in doing so, especially after he was threatened a second time by Fontenot with the filing of a grievance complaint about the attack at Cell 03.

Hughes admittedly made no effort to challenge the filing of the disciplinary report and instead acquiesced to signing a report which he also indicated he did not think was necessary. Specifically, he testified that he did not think that Fontenot's use of inappropriate language towards him warranted a disciplinary write-up. It was not until after the investigation began that disciplinary charges were considered and placed against Fontenot. Hughes signed the report without challenging Jenkins or addressing the matter with another or more superior officer. The Court finds that Hughes was inappropriately motivated in signing the disciplinary report against Fontenot.

Having made this finding, the Court nonetheless finds that Fontenot has failed to establish other key factors of his retaliation claim.  First, Fontenot links his claim to the filing of his grievance complaint about Deputy Hughes.  In other words, the filing of the grievance was retaliated against by the filing of the disciplinary report.  It is well settled that prison officials may not retaliate against a prisoner for exercising his First Amendment right to complain through proper channels about a prison guard's misconduct.  *Morris*, 449 F.3d at 684; *Woods*, 60 F.3d at 1164.  In this case, however, the evidence shows that Fontenot had no violated constitutional right and was not prevented from exercising his right to file and pursue his grievances.

To recover for a retaliatory act, he would have to prove that his right to file grievances was violated.  It was not.  Fontenot himself established that he completed all three steps of the grievance process at OPP.  Although he was not successful, he was not prevented from exercising his right to pursue relief through the grievance process.

In addition, Fontenot had no adverse effect from the disciplinary charge placed against him. He testified that the charge was not further pursued against him, and he was never punished as a result of the disciplinary charge.  In addition, the Court must note that Fontenot has not established that the disciplinary charge based on disobedience and/or the use of inappropriate language toward Deputy Hughes was unfounded.  Fontenot's own witnesses testified that Fontenot "had words" with Deputy Hughes.  Fontenot also conceded at trial that during his transfer, he disobeyed several directives from Hughes to enter the cell and that he did talk back and threatened Hughes about having his family lodge a complaint about the transfer.  These verbal confrontations were sufficient to support a charge of disobedience and improper language which would be contrary to prison rules.

Furthermore, a prisoner's claim that he was charged with a disciplinary infraction that he did not commit is not alone sufficient to prove a deprivation of due process. *Collins v. King*, 743 F.2d 248, 253-54 (5th Cir. 1984); *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). Without some adverse impact from the charge, Fontenot has not demonstrated a compensable violation of his Fourteenth Amendment rights arising from the mere filing of the disciplinary complaint. *See Sandin v. Conner*, 515 U.S. 472, 484-87 (1995).

For these reasons, Fontenot has failed to prove facts necessary to recover for his claim that Deputy Hughes retaliated against him or that the defendants conspired to violate his constitutional rights.

### D. Qualified Immunity Defense

The defendants have urged qualified immunity as a defense to the federal claims raised by Fontenot. Because the Court has not found liability on the part of Deputies Rasbury and Eli, the defense is addressed as to Hughes with regard to the excessive force claim for which the Court has found him liable.

The doctrine of qualified immunity "shield[s] [officers] from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). To determine whether a defendant is entitled to qualified immunity, this Court must address the factors: "(1) whether the facts that the plaintiff has alleged make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Edwards v. Loggins*, 476 Fed. App'x 325, 328 (5th Cir. 2012) (quoting *Jennings v. Patton*, 644 F.3d 297, 300 & n.3 (5th Cir. 2011) (internal quotation marks and citation omitted). "Although nominally an

affirmative defense, the plaintiff has the burden to negate the defense once properly raised." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

In this case, the Court has positively answered the first query finding that Deputy Hughes used excessive force in violation of Fontenot's constitutional rights. The defendants have not suggested nor is there any basis to find that the right against the use of excessive force is well established or that Deputy Hughes should have known that pushing, shoving, or slamming an inmate into a wall or onto the floor of a cell under the circumstances of this case, where there was no physical threat to the officer, was excessive and prohibited by law. His actions were not objectively reasonable under the circumstances. The Court therefore denies the defendant's request for qualified immunity from the use of excessive force in this case.

### E. State Law Claims

#### 1. Assault and Battery by Deputy Hughes

Fontenot raised claims that Deputy Hughes's actions constituted both assault and battery under Louisiana law. Because the Court has found credible the evidence showing that Deputy Hughes pushed, shoved, and/or slammed Fontenot against the cell wall and floor, the state law claims must be addressed.

Under Louisiana law, a battery is defined as an intentional harmful or offensive contact with a person. *Doss v. Morris*, 86 Fed. App'x. 25, 27-28 (5th Cir. 2004) (citing *Lowrey v. Pettit*, 737 So.2d 213, 216 (La. App. 2d Cir. 1999)); *Caudle v. Betts*, 512 So.2d 389, 391 (La. 1987). To establish a battery, the plaintiff need not prove malice or an intent to inflict actual damage. *Doss*, 86 Fed. App'x at 28. Instead, the plaintiff must prove that the person intended to inflict an offensive contact without the plaintiff's consent. *Id*.

An assault is defined in Louisiana tort law as an attempt to commit a battery. *Doss*, 86 Fed. App'x. at 28 (citing *Bulot v. Intracoastal Tubular Services, Inc.*, 730 So.2d 1012, 1018 (La. App. 4th Cir. 1999). Words alone do not constitute an assault, but "a combination of threats, present ability to carry out the threats, and reasonable apprehension of harmful or offensive contact may suffice." *Groff v. Southwest Beverage Co., Inc.*, 997 So.2d 782, 787 (La. App. 3d Cir. 2008) (citing *Muslow v. A.G. Edwards & Sons, Inc.*, 509 So .2d 1012, 1020 (La. App. 2d Cir. 1987)). Under Louisiana law, the use of "excessive force transforms ordinarily protected use of force into an actionable battery, rendering the defendant officer and his employer liable for damages." *Zerbe v. Town of Carencro*, 884 So.2d 1224, 1228 (La. App. 3d Cir. 2004) (quoting *Penn v. St. Tammany Parish Sheriff's Office*, 843 So.2d 1157, 1161 (La. App. 1st Cir. 2003)).

As discussed above, Fontenot has established that Deputy Hughes used excessive force against him when he was slammed around in Cell 03. Necessarily, the evidence demonstrates that an offensive and un-consented to contact occurred between Hughes and Fontenot. The evidence proved that a battery occurred.

The evidence did not demonstrate, on the other hand, that Fontenot was placed in reasonable apprehension of receiving an injury from Hughes before or after the attack occurred. The evidence was therefore insufficient to prove an assault.

### 2.        Intentional Infliction of Emotional Distress by the Defendants

Fontenot also alleges that the actions of the defendants caused an intentional infliction of emotional distress upon him. As mentioned previously, because the Court has not found any wrongful action by Deputies Rasbury or Eli, there is no evidence that they would have caused an

intentional infliction of emotional distress.  This claim is addressed with respect to the actions taken by Hughes.

In order to prevail on a claim of intentional infliction of emotional distress under Louisiana law, a plaintiff must establish "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct ."  *Nicholas v. Allstate Ins. Co.*, 765 So.2d 1017, 1022 (La. 2000) (quoting *White v. Monsanto*, 585 So.2d 1205, 1209 (La. 1991)).  The conduct in question must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *White*, 585 So.2d at 1209.

As detailed above, the Court has found that the force used by Hughes in Cell 03 was excessive and that he likely had some retaliatory intent (though not a constitutional violation) in signing the disciplinary charges against Fontenot.  The evidence, however, does not demonstrate the kind of outrageous conduct by Hughes, or the other deputies, that would constitute an intentional infliction of emotion distress.  *See*, *Nicholas*, 765 So.2d at 1022 (conduct which is merely tortious or illegal does not rise to the level of extreme and outrageous conduct required in an action for intentional infliction of emotional distress).  Further, Fontenot failed to present evidence of a medical diagnoses or other treatment for an emotional damage or that any such emotional distress was severe.  Accordingly, the Court finds that Fontenot failed to establish a claim of intentional infliction of emotional distress.

### 3.    Qualified Immunity Under State Law

The defendants have urged qualified immunity as a defense to the state law claims raised by Fontenot.  Because the Court has not found liability on the part of Deputies Rasbury and Eli, the defense is addressed as to Hughes with regard to the battery claim for which the Court has found him liable.

Under Louisiana law, public officials, including prison employees, are entitled to qualified immunity when performing discretionary functions. *Jackson v. State of La., Dep't of Corrs.*, 785 So.2d 803 (La. 2001); *see also*, *McManus v. State of La., Dep't of Wildlife and Fisheries*, 33 So.3d 412 (La. App. 3d Cir.), *writ denied*, 38 So.3d 323 (La. 2010).  "The standard applicable in determining whether qualified immunity should be recognized is 'objective reasonableness.'" *Ortego v. Landry*, 746 So.2d 613 (La. App. 3d Cir. 1999) (citations omitted); *Winston v. City of Shreveport*, 390 Fed. App'x. 379, 385-86 (5th Cir. 2010) ("Under Louisiana law, we apply the same "reasonableness" standard . . . when analyzing . . . qualified immunity . . . .).

In Louisiana "[t]he governmental official has the burden of proving the defense of qualified immunity." *La. Farms v. La. Dep't of Wildlife and Fisheries*, 685 So.2d 1086, 1093 (La. App. 3d Cir. 1996).  The trier of fact determines whether, under the facts of the particular case, the officers are entitled to qualified immunity. *McManus*, 33 So.3d at 412.

As already resolved with respect to the federal claims, Deputy Hughes actions were not objectively reasonable or entitled to qualified immunity.  Under the like standard applied in Louisiana, the Court can find no reason to change that conclusion.  The Court therefore denies the defendant's request for qualified immunity from liability for the battery claim.

### III.   Proven Damages Pursuant to 42 U.S.C. § 1988

The evidence presented at trial is sparse at best in offering proof of the value of any injury or compensable damage done to the plaintiff as a result of the excessive force or battery. Having found that an injury did occur, the Court is left to posit nothing more than general damages for the pain and suffering and injury to his shoulder. The credible evidence showed that Fontenot suffered some shoulder injury and other minor abrasions as a result of the force used. By the time he was seen by the nurse, he was more mobile and able to remove his own shirt. This is the extent of the proven span of damage or injury recoverable. Without proof of any other special damages, the Court is not able to assign a value beyond those general damages.

### A.   Damages for Excessive Force

In an effort to obtain guidance on the issue of the appropriate amount of damages for Fontenot's shoulder and any incidental injuries, the Court has considered compensatory damages awarded in cases in which a prisoner was subjected to excessive force by a correctional officer under similar circumstances. The jury and damages awards vary widely in these cases: *see Jackson v. Austin*, 241 F. Supp. 2d 1313, 1323 (D. Kan. 2003) (awarding $15,000 in § 1983 action to prisoner who was grabbed by three officers, pushed to the floor, handcuffed, and dragged 50 yards on the floor, causing a contusion, swelling of his knee, shoulder and wrists and "severe and excruciating pain"); *Morrison v. Davis*, 88 F. Supp. 2d 799 (S.D. Ohio 2000) (addressing award of attorney's fees after prisoner was awarded $12,000 in compensatory damages for beating by a corrections officers); *Evans v. Hennessy*, 934 F. Supp. 127 (D. Del.1996) (awarding $75,000 in compensatory damages where corrections officer hit inmate twice on his face, causing inmate to trip over his personal belongings and re-aggravate a pre-existing back injury); *Hynes v. LaBoy*, 887 F. Supp. 618, 626-27

(S.D.N.Y. 1995) (upholding jury award of $1,250 of compensation for inmate who suffered two cuts and a black eye); *Williams v. Omodt*, 640 F. Supp. 120, 122-23 (D. Minn. 1986) (awarding $5,000 in § 1983 action to inmate who suffered "bruises, contusions, swelling, and considerable pain, but no permanent physical injury" as a result of unlawful beating by guard); *Wheatley v. Ford*, 679 F.2d 1037, 1040 (2d Cir. 1982) (remitting damages from $55,000 to $25,000 on basis that plaintiff's injuries in police brutality case were severe but temporary); *Edwards v. Kelly*, 1990 WL 106851, at *5 (S.D.N.Y. Jul. 23, 1990) (awarding plaintiff who claimed he had been beaten by police officers in a late-night encounter $500, where the plaintiff was punched only once unlawfully, causing a cut lip and bruised jaw, with no permanent injuries and no visible injury just two days after the incident).

Thus, in light of the evidence and testimony and the foregoing awards, the Court finds a reasonable amount of damages for the use of excessive force in this case to be $25,000.00.

## B.    <u>Damages for Battery</u>

Under Louisiana law, the guiding precedent on awards for battery by an officer causing injuries similar to Fontenot's are just as varied with very little related to a prisoner-plaintiff like Fontenot: *See Smith v. City of Shreveport*, 73 So.3d 496, 502 (La. App. 2d Cir. 2011) (affirming awards of $10,000 in general damages to <u>arrestee</u> for injuries sustained for battery by use of excessive force during arrest); *Miller v. Village of Hornbeck*, 65 So.3d 784, 792 (La. App. 3d Cir. 2011) ($25,000 in general damages to <u>arrestee</u> as combined recovery for battery during arrest when officers used excessive force); *Patton v. Self*, 952 So.2d 874, 881 (La. App. 3d Cir. 2007) (affirming award of $20,000 in general damages to <u>arrestee</u> as combined recovery for battery during arrest when officers used excessive force); *Gullette v. State through Dept. of Corrections*, 383 So.2d 1287,

1289 (La. App. 1st Cir. 1980) (inmate awarded $2,000 for stab wound to leg inflicted by prison guard when inmate refused to give guard a cigarette); *Myles v. Falkenstein*, 317 So.2d 292, 295 (La. App. 4th Cir. 1975) (inmate awarded $6,000 after deputy struck him without provocation and broke his jaw).

Considering the facts of this case, and the award already given for the excessive force arising from the same action by Deputy Hughes, the Court will award for the battery under state law an additional $5,000.00 plus applicable interest as allowed by law.

In addition, with respect to the state battery claim, the defendants have urged the doctrine of comparative fault which provides for a reduction of any damage recovery "in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss." La. Civ. Code Ann. art. 2323. In this case, such a defense is not applicable. For the statute further provides:

> [I]f a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an *intentional* tortfeasor, his claim for recovery of damages shall *not* be reduced.

La. Civ. Code Ann. art. 2323(C) (emphasis added).

In this case, the successful state claim of battery is an intentional tort under Louisiana law and the comparative fault doctrine does not lesson Fontenot's recovery. *See Le v. Nitetown, Inc.*, 72 So.3d 374, 376-80 (La. App. 3d Cir. 2011).

### C.     Punitive Damages under § 1983

Fontenot has also asked for punitive damages to be awarded in connection with the violation of his constitutional rights, i.e. excessive force. An award of punitive damages rests on the Court's "discretionary moral judgment" as to the punishing and deterring effect punitive damages might

have against this defendant. *See Smith v. Wade*, 461 U.S. 30, 50-52 (1983). But punitive damages may be awarded only when the defendant's conduct is found to be "'motivated by evil intent' or demonstrates 'reckless or callous indifference' to a person's constitutional rights." *Sockwell v. Phelps*, 20 F.3d 187, 192 (5th Cir. 1994) (citing *Smith*, 461 U.S. at 56). The latter standard requires "recklessness in its subjective form," that is, "a 'subjective consciousness' of a risk of injury or illegality and a 'criminal indifference to civil obligations.'" *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999) (citing *Smith*, 461 U.S. at 37 n.6, 41).

Although the Court has awarded compensatory damages in this case, it exercises its discretion not to award punitive damages as it finds that, although Hughes's actions were unconstitutional, under the circumstances and considering the taunting by Fontenot, the actions were not of the level of unconscionable behavior that would warrant a punitive award.

### D.    Attorney's Fees under § 1988

Fontenot has also sought attorney's fees pursuant to 42 U.S.C. § 1988, which allows the award of reasonable attorney's fees to the prevailing party in civil rights cases, including suits brought under § 1983. *Fox v. Vice*, __ U.S. __ 131 S. Ct. 2205, 2213 (2011). The Court finds that reasonable fees should be awarded in this case.

## IV.    Conclusion

Accordingly, for the foregoing reasons, and considering the evidence adduced at trial,

**IT IS ORDERED** that Fontenot's motion to voluntarily dismiss the 42 U.S.C. § 1983 and state law against Orleans Parish Sheriff Marlin Gusman is **GRANTED** and the claims against that defendants are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Fontenot's claims under 42 U.S.C. § 1983 of unreasonable search and seizure in violation of the First and Fourteenth Amendment, cruel and unusual punishment in violation of the Eighth Amendment, and conspiracy and retaliation under the Fourteenth Amendment, and under Louisiana tort law of intentional infliction of emotional distress, against Deputy Jeffrey Rasbury and Deputy Marlon Eli are **DISMISSED WITH PREJUDICE** as meritless after considering the evidence adduced at trial and judgment will be entered accordingly.

**IT IS FURTHER ORDERED** that Fontenot's § 1983 claim of excessive force is found to have merit as urged against defendant Deputy Jerome Hughes as is Fontenot's state law claim of battery, and the Court hereby awards Fontenot damages in the amount of $25,000.00 for the use of excessive force against him by Hughes in violation of the Eighth Amendment as urged under § 1983 and damages in the amount of $5,000.00 plus legal interest for the battery committed by Hughes under state law, and the award of reasonable attorney's fees under 42 U.S.C. § 1988 related to the federal civil rights claim.

**IT IS FURTHER ORDERED** that Fontenot's § 1983 claims of unreasonable search and seizure in violation of the First and Fourteenth Amendment, conspiracy and retaliation under the Fourteenth Amendment, and under Louisiana tort law of assault and intentional infliction of emotional distress, against Deputy Hughes are **DISMISSED WITH PREJUDICE** as meritless after considering the evidence adduced at trial. Judgment shall be entered accordingly.

**IT IS FURTHER ORDERED** that Fontenot shall file a motion to fix attorney's fees into the record on or before **Tuesday, November 13, 2012**, along with: (1) an affidavit attesting to the attorney's education, background, skills, and experience; (2) sufficient evidence of rates charged in similar cases by other local attorneys with similar experience, skill and reputation; and (3) the

documentation required by Local Rule 54.2. Any opposition to the expenses and fee application shall be filed no later than **Tuesday, November 20, 2012**. Fontenot shall at the time of his filing notice the motion to fix attorney's fees for hearing on **Wednesday, November 28, 2012**, and the motion shall be submitted on that date **without oral argument**. **The Court retains jurisdiction to consider and award fees pursuant to this Order.**

New Orleans, Louisiana, this 18th day of October, 2012.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**